[Civ. No. 6264. First Appellate District, Division One.—August 27, 1928.]

HERBERT F. BRIGGS et al., Respondents, v. JESS MEAD, INCORPORATED (a Corporation) et al., Appellants.

Cooley & Gallagher, and Lasher B. Gallagher for Appellants.

W. E. Simpson and Walter Sorenson for Respondents.

KNIGHT, J.—On December 31, 1925, shortly after the noon hour, Mrs. Edna W. Briggs was walking along the sidewalk in front of a lot situate on the corner of Inyo and Fulton Streets, Fresno, which was being operated as a sales place for used automobiles, when the defendant Lani, accompanied by the defendant Dendinger, attempted to drive an automobile across the sidewalk from the street into an open gateway at the corner of said lot, and in doing so struck Mrs. Briggs, inflicting injuries of an internal character from which she died the same day. This action was subsequently commenced by her surviving husband and three children to recover damages resulting from her death. Upon trial a jury awarded a verdict in their favor and from the judgment entered thereon the defendants Jess Mead, Incorporated, and Dendinger have appealed, urging as grounds for reversal that the evidence is insufficient to sustain the verdict and that the trial court erred in ruling upon the admissibility of evidence and in instructing the jury.

The first point made against the sufficiency of the evidence relates to the issues of the negligent operation of the automobile and the contributory negligence of the deceased. The circumstances attending the accident, briefly stated, were

as follows: The lot where the accident occurred is situate on the southwest corner of said streets, and was inclosed by chains, the gateway thereto being located directly across the corner thereof and being marked by posts on each side which stood thirteen feet apart. Dendinger was a salesman connected with said lot and had taken Lani, a prospective buyer, out in the automobile in question, a Maxwell touring car, for a demonstration, and before returning to the lot requested Lani to drive, which the latter was doing when the accident occurred. As they approached the lot they drove up the easterly side of Fulton Street in a northerly direction beyond the center of its intersection with Inyo Street, which runs nearly at right angles with Fulton, and then made a left half circle turn in Fulton Street and proceeded southerly in the opposite direction down the westerly side of Fulton Street, across the intersection, until they reached the corner of the sidewalk and then they turned slightly to the right to enter the gateway. Mrs. Briggs was walking southerly down Fulton Street on the same side as said lot. She had crossed the intersection of Inyo Street and had reached a point about opposite the southerly gate-post on Fulton Street when Lani approached from the rear and sounded his horn. At that time the automobile was in the street at the corner opposite the gateway about three or four feet from the street curb and was headed diagonally into the lot. It was also twenty-five feet distant from Mrs. Briggs and traveling between two and three mile an hour. Upon hearing the horn Mrs. Briggs turned around suddenly and evidently believing that the automobile was coming down the sidewalk toward her screamed and ran around the post into the gateway of the lot. Lani saw that she was confused, and the evidence shows beyond question that at that time he could have easily applied the brakes and stopped the car; but either because of excitement and lack of control of the car, or believing that Mrs. Briggs would get out of the way or that he would be able to steer the car so as to avoid striking her, he took no measures to stop the car. Instead he continued to drive forward at the same rate of speed, with the result that she tried to dodge the automobile and in doing so was struck and thrown against the post, causing the injuries from which she died.

In view of the situation above described a question of pure fact was presented for the jury to decide as to whether Mrs. Briggs' death, if resulting from negligence, was proximately caused by the negligent operation of the automobile or a failure on her part to exercise ordinary care for her own safety, and both of these issues having been determined against appellants' contention, our authority on appeal is limited to an ascertainment of whether the evidence is legally sufficient to support such determination. We are of the opinion that it is. As said in *Raymond* v. *Hill*, 168 Cal. 473 [143 Pac. 743] : " . . . no person who has ever ridden in or driven an automobile can be unaware of one fact, and that is that pedestrians, and women particularly, are liable to sudden panic upon the unexpected approach of this terrifying machine. In the exercise of 'every reasonable precaution' which the law enjoins, it is well within the spirit of the law to say that the driver of an automobile approaching pedestrians, and particularly women, must have his car under such control as that it may be promptly stopped. The sounding of the horn and the noise occasioned by the muffler cut-out are each and both well enough in their way, but they do not embrace and conclude all of the duties of the driver of the automobile."

In the present case the evidence is without conflict that Mrs. Briggs was proceeding along the sidewalk, in which position she had the right to believe she would be safe from the approach of automobiles; and that when she heard the horn and saw the automobile apparently coming toward her she became terrified and confused, and sought safety in the gateway of the lot. Lani while testifying admitted that he saw that she was confused; and it is manifest that he could have easily avoided any further danger by simply applying his brakes and stopping the car, because at that time he was twenty or more feet distant from her and was traveling less than three miles an hour. Therefore, the fact that he did not stop justifies the conclusion reached by the jury that he did not exercise ordinary care. The facts of the present case differ materially from those of *Depons* v. *Ariss*, 182 Cal. 485 [188 Pac. 797], which has been cited by appellant, for in the latter case the deceased was in the street and negligently exposed himself to danger by stepping

suddenly into the pathway of the approaching truck; and, unlike the present case, the driver there immediately upon seeing the danger shut off his engine, applied the brakes, and, as the opinion therein states, "used every proper care and precaution to avoid injuring" the deceased. The other case appellant cites (*Wall* v. *Merkert*, 166 App. Div. 608 [152 N. Y. Supp. 293]), is no closer to the point at issue than is *Depons* v. *Ariss*, *supra*, for the reason that there, too, the injured party was in the street and stepped suddenly in front of the automobile, giving the driver thereof not the slightest opportunity to stop his machine or otherwise avert the collision.

The second point urged as to the insufficiency of the evidence relates to the question of the legal liability of appellants Jess Mead, Incorporated, and Dendinger, it being contended that neither was sufficiently connected with the ownership of the automobile or its operation by Lani to hold either of them responsible for his acts.

The evidence bearing upon the question of the ownership of the car was in substance as follows: Jess Mead, Incorporated, was the sales agent in Fresno for the Chrysler and Maxwell automobiles; and it was also engaged in the business of selling used cars taken in as part payment for new ones. On July 6, 1925, it sold the Maxwell car involved here, under the usual form of a conditional sales contract, to one Wainscoat, title being reserved in Jess Mead, Incorporated, until all deferred payments were made. Thereupon the sales contract was assigned to the Pacific Finance Corporation under a form of assignment whereby Jess Mead, Incorporated, guaranteed to its assignee the "fulfillment of said contract (by the purchaser) according to its terms, and the payment of all moneys due and to become due thereunder, and all costs, including reasonable attorney's fees incurred in collecting the money or attempting the collection thereof, or the enforcement of any right, under said contract, or under this guarantee, . . . and further agree that should the assignee take possession of said property, for failure of the purchaser to perform any of the conditions of said contract, to at once pay to the assignee, the balance owing by the purchaser under the terms of said contract, upon the conveyance of said property to ——, or

——— agreed that the assignee may sell the said property without notice of any kind, for such price as it can secure for the same, and in the event that said property does not sell for enough to pay any deficiency; . . . ''

The certificate issued by the state motor vehicle department designated the Finance Company as the ''legal owner'' and Wainscoat as ''registered owner''; and the so-called ''pink'' certificate issued by said department was delivered to and held by the Finance Company. Some time prior to November, 1925, Wainscoat defaulted in his payments and otherwise violated the conditions of the sales contract so that early in November, 1925, the Finance Company, exercising its rights under the contract, repossessed the car, which was immediately redelivered, according to the testimony of its manager, to Jess Mead, Incorporated, at its lot on the corner of Inyo and Fulton Streets. At the same time the Finance Company notified Jess Mead, Incorporated, in writing that it had repossessed said car and delivered the same to the lot above mentioned; and that ''repossession figures'' would be furnished as soon as the same were received from San Francisco; and subsequently two demands in writing were made by the Finance Company upon Jess Mead, Incorporated, for the balance of the purchase price due under the sales contract. The car remained on said lot until the date of the accident and thereafter until April, 1926, at which time Jess Mead, Incorporated, secured a purchaser therefor, who was sent by the latter's office manager to the Finance Company to pay the balance due on the contract and obtain the ''pink'' certificate properly indorsed.

The evidence further shows that upon being notified by the Finance Company of the repossession of said car and the delivery of the same to said lot Jess Mead, Incorporated, in accordance with its usual custom, made out at its head office a ''car receipt'' record in duplicate, describing the car and setting forth further information with reference thereto, one of which was kept at its head office and the other sent to the office of the lot and placed in a loose-leaf binder known as the ''Used Car Book,'' by Fred Deutch, the manager of said lot. This book constituted the sole record of used cars placed on said lot by Jess Mead, Incorporated; and it included also the records of other used cars delivered

to Deutch by other parties for the purpose of sale. Said book was produced in court by Deutch, but it appears that the record pertaining to the car involved in this accident was missing therefrom. Deutch stated that he had not removed it nor did he know what had become of it; that he discovered only the day before he testified that it had been extracted from the book. The records mentioned consisted of printed forms with appropriate spaces for filling in the necessary data and were entitled "Car Receipt Records, Jess Mead Inc. Fresno."

Regarding the legal relationship of the parties charged with responsibility for the accident the evidence was as follows: Some time in 1924 Dendinger applied to Jess Mead for a position to sell its used cars, and was informed that Jess Mead, Incorporated, maintained no separate used car salesrooms, but Mead told Dendinger he would see what could be done. A few days later Mead phoned Dendinger that he had rented the Black building in Fresno as a salesroom for used cars and the next day Dendinger was given employment. The keys to the place were delivered to him and his duties consisted of opening up the place in the morning and locking it up at night, and demonstrating and selling the used cars, and for his services he was paid a commission of five per cent on whatever sales he made.

During this time Fred Deutch was operating the lot in question for the sale of used cars under the name of "C & D Sales Company," a sign bearing this inscription being maintained over the gateway to the lot; and about the first of July, 1925, Jess Mead, Incorporated, discontinued its salesrooms in the Black building and made arrangement with Deutch for the sale of its used cars at this lot. In furtherance of this arrangement, Jess Mead, Incorporated, assumed and afterward paid the rental of the corner lot in question and paid Deutch a salary of two hundred dollars a month and commission to handle the sale of its used cars. It also replaced the "C & D Sales Company" sign over the gateway with one reading "Jess Mead Incorporated Used Car Lot. Fred Deutch, Manager." All expenses for repairs to the cars were paid and all gasoline and oil consumed in the demonstration thereof were furnished by Jess Mead, Incorporated. Additional ground space adjacent to the

corner lot was rented independently by Deutch and operated by him for the sale of used cars placed with him by other parties, and with which Jess Mead, Incorporated, had nothing to do. When the salesrooms in the Black building were discontinued Dendinger was informed of the arrangement with Deutch and was told to apply to Deutch for further employment, which he did, and was hired under the same conditions as prevailed at the Black building. He was given the keys to the lot and was obliged to close it at night by placing and locking a chain across the gateway and open up in the morning. It was his duty also to demonstrate and sell the used cars, and in doing so he was permitted and expected to let the prospective buyers drive the cars. For the services thus rendered he was paid the same compensation as before, a commission of five per cent on all sales made by him; and he was allowed also to demonstrate and sell other used cars which Deutch handled for other parties.

The effect of the foregoing evidence is that when Wainscoat violated his contract of purchase the automobile in question was seized by the Finance Company as legal owner thereof; and that thereupon, exercising its rights under the contract of assignment, it turned the same over to Jess Mead, Incorporated, and served the latter with notice to pay the balance due on the contract. Jess Mead, Incorporated, therefore, to all intents and purposes, succeeded to all of the rights and liabilities of Wainscoat as equitable owner of said automobile; and its status remained such until it finally effected a sale of the automobile in April, 1926. In the meantime, being in possession of the automobile, it placed the same on sale at its lot, with its used car sales manager Deutch, who was given full authority to allow demonstrations to be made thereof for the purposes of sale; and while the automobile was being demonstrated under those conditions it was negligently operated and became the direct cause of the accident which resulted in the death of Mrs. Briggs. Therefore, under such circumstances, we are of the opinion that the jury was warranted in finding that Jess Mead, Incorporated, was liable jointly for the accident with Dendinger, who was in direct charge of the automobile at the time it was negligently driven. In its facts the pres-

ent case is almost identical with *Wooding* v. *Thom,* 148 App. Div. 21 [132 N. Y. Supp. 50], which was cited approvingly in *Easton* v. *United Trade School Con. Co.,* 173 Cal. 201 [L. R. A. 1917A, 394, 159 Pac. 597]; and in our opinion is subject to the reasoning set forth therein and must be controlled by the legal principles there stated.

In support of its contention that Jess Mead, Incorporated, was not liable, appellants rely mainly upon the case of *Barton* v. *Studebaker Corp.,* 46 Cal. App. 707 [189 Pac. 1025], but we think that the case is to be differentiated from the one before us upon the following grounds: There, a salesman named Owens, whose business was merely that of seeking and finding and procuring purchasers for said corporation, was driving a prospective buyer named Mrs. Barton to the salesrooms of said corporation for the purpose of allowing her to examine the cars on display there, and while on the way there collided with another automobile and Mrs. Barton was injured. The automobile which Owens was driving at the time was his property, which he maintained and operated at his own expense; and regarding the nature of his employment the evidence shows that he was at liberty to go and come where and when he pleased, and to exercise his own judgment as to the parties with whom he dealt and the manner and means to be employed in the accomplishment of his work. Here, Dendinger had the keys to the sales lot and apparently had regular hours of employment, for he was "supposed to" and did open the place of business at 8 o'clock in the morning and closed it at 6 o'clock at night; and it was his duty also, in addition to that of soliciting business, to demonstrate to prospective buyers the various cars owned by Jess Mead, Incorporated; and at the time the accident occurred he was actually engaged in the pursuit of those duties, and the car of which he then had control belonged to and was being maintained by Jess Mead, Incorporated. Therefore, in our opinion, his status did not fall within the class of an independent contractor (*Curran* v. *Anthony,* 77 Cal. App. 462 [247 Pac. 237]).

Appellants assign as error the rulings of the trial court made over appellants' objection allowing Dendinger to testify that he was "employed" by Jess Mead, Incorporated, and in permitting Deutch to testify that he was "handling"

the Maxwell car in question for Jess Mead, Incorporated, citing *Winslow* v. *Glendale Light & Power Co.*, 164 Cal. 688 [130 Pac. 427]. The case mentioned holds in effect that when the question of employment is the issue in the case a witness should not be permitted to testify to his conclusion that he "was working for" the defendant; but that his testimony should be limited "to a statement of the persons by whom he was employed, the nature, terms, and surrounding circumstances of his employment," which was substantially all that Dendinger testified to here, his preliminary answer to the effect that he was "employed" by Jess Mead, Incorporated, being followed and supported by much more testimony showing the nature, terms, and surrounding circumstances of such employment; and as to Deutch's testimony, his preliminary statement that he was "handling" the Maxwell car for Jess Mead, Incorporated, was also followed and supported by much more testimony showing how, when, where, and under what circumstances said car was delivered to him and as to the facts surrounding his employment and the nature thereof. Therefore, aside from any conclusions of the witnesses, the evidence in the present case is sufficient to establish the facts that Dendinger was employed by, and that Deutch was handling the automobile for, Jess Mead, Incorporated. That being so, there is no ground for reversal even though it be assumed that the two preliminary statements of the witnesses to which appellants object were erroneously admitted (*Winslow* v. *Glendale Light & Power Co.*, *supra*).

█ Nor do we find any merit in appellants' objections to the instructions. In two or three of them, wherein the court stated to the jury the affirmative allegations of the answers regarding contributory negligence the article "the" was used instead of the article "a" before the words "proximate cause"; but elsewhere in the court's charge the jury was fully and correctly instructed upon the doctrine of proximate cause in connection with contributory negligence, and therefore the error complained of, if any, was not prejudicial (*Squier* v. *Davis Standard Bread Co.*, 181 Cal. 533 [185 Pac. 391]). The several instructions bearing upon the matter of fright were doubtless founded upon the law as declared in the case of *Raymond* v. *Hill, supra*, and

bearing in mind that the negligence here did not consist in sounding the horn, but in negligently operating the automobile after the horn was sounded, we are convinced that the instructions complained of correctly stated the legal principles pertaining to the particular facts of the case.

And regarding those instructions which appellants object to upon the ground that they omitted the element of proximate cause, it is sufficient to say that elsewhere the jury was fully and fairly instructed upon that branch of the case, and "No citation of authority is needed to the point that these instructions must be read as a whole and that each instruction need not be complete in itself. Thus, where the expression 'through the negligence of the defendants' is used it is not necessary to repeat in every paragraph of the instructions that such negligence must be 'the proximate cause of the injury sustained.' '' (*Aubel* v. *Sosso,* 72 Cal. App. 57 [236 Pac. 319].)

The remaining assignments of error are not sufficiently important to require discussion.

The judgment is affirmed.

Tyler, P. J., and Campbell, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on September 26, 1928, and a petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on October 25, 1928.

All the Justices present concurred.